STANDARD CONTAINER MANUFACTUR-
ERS' ASS'N, Inc., et al. v. FEDERAL
TRADE COMMISSION.

No. 9523.

Circuit Court of Appeals, Fifth Circuit.

April 23, 1941.

F. C. Hillyer, of Jacksonville, Fla., and Haywood H. Hillyer, Jr., of New Orleans, La., for petitioners.

W. T. Kelley, Chief Counsel, Federal Trade Commission, Edw. W. Thomerson, and James W. Nichol, Sp. Attys., Federal Trade Commission, and Martin A. Morrison, Asst. Chief Counsel, Federal Trade Commission, all of Washington, D. C., for respondent.

Before FOSTER, HUTCHESON, and McCORD, Circuit Judges.

HUTCHESON, Circuit Judge.

Petitioners, a trade association, its members, former members and officers, sue to set aside a cease and desist order of the Commission.[1] They complain of the order as invalid in whole and in part; in whole as with-

---

[1] "It is ordered that the respondents * * *, cease and desist from entering into, or carrying out, any understanding, agreement, combination or conspiracy between and among any two or more of said respondents, or between any one or more of said respondents and any other member or members of the industry, for the purpose or with the effect of restricting, restraining or monopolizing, or eliminating competition in, the sale in interstate commerce of wooden containers used in packaging fruits and vegetables, variously described and referred to as crates, baskets, boxes, hampers, lugs, cups and trays, and the parts thereof, and as a part of such understanding, agreement, combination and

out support in the evidence and indefinite, arbitrary and unreasonable; in part as beyond its jurisdiction, as to eighteen of the petitioners, because engaged wholly in intrastate commerce, and as to four, because almost entirely so engaged. They pray; that it be set aside and dismissed in whole, or in the alternative; that it be set aside and dismissed as to eighteen of the petitioners engaged wholly in intrastate commerce; four engaged mainly so; six, which have gone out of business; and one, which is now in bankruptcy; and that if not dismissed in whole, it be modified and restricted.

The commission, replying to the jurisdictional point, insists that the proceeding is one against the Association, its members and officers, to prevent and prohibit the continuance of a conspiracy to fix prices in interstate commerce, and that its jurisdiction extends over all of the parties to the agreement, though some of them are engaged wholly in intrastate commerce. As to the claim that the order should be set aside as to those who have ceased doing business, and have taken bankruptcy, and they should be dismissed from the proceeding, the commission insists; that it is settled law that the order takes effect and is affirmed, or its affirmance is denied, not in accordance with the situation existing at the time of the hearing here, but at the time the proceeding was had before it; and that the fact that some of the respondents to the proceeding have, since its institution, gone out of business, or taken bankruptcy, is not a ground for setting the order aside.

■ Finally, it insists that each and every one of the findings has full support in

conspiracy from doing any of the following acts or things:

"1. Agreeing to fix and maintain, or fixing and maintaining, uniform or minimum prices.

"2. Agreeing to fix and maintain, or fixing and maintaining, uniform terms and conditions of sale, such as maximum discounts, brokerage fees, freight and other allowances and time limitations in contracts.

"3. Agreeing to curtail, or curtailing, production of such containers or the parts thereof or agreeing to check, or checking, the production of the mills of other parties to such an agreement to determine if such other mills have curtailed production as agreed upon.

"4. Threatening, coercing or in any wise intimidating members of the industry in an effort to induce such members to become parties to said understanding, agreement, combination or conspiracy or to induce such members to maintain the prices fixed by, or to curtail production in furtherance of, said understanding, agreement, combinations or conspiracy.

"5. Filing with the respondent association, Standard Container Manufacturers' Association, Inc., its officers, agents or employees, any report as to the manner and form in which any member of the industry is carrying out any agreement or understanding with reference to prices or production.

"6. Reporting to or conferring with respondent James B. Adkins, or any officer, agent or employee of said respondent association, as to the prices at which said products are to be sold or as to the curtailing of the production of any of such products, or as to the failure of any member of the industry to carry out any agreement or understanding on the part of such member of the industry to maintain prices, terms and conditions of sale or to curtail production.

"It is further ordered that the respondent Standard Container Manufacturers' Association, Inc., its officers, agents and employees, and the respondents, James B. Adkins, Charles P. Chazal, and Russell W. Bennett, forthwith cease and desist aiding, abetting or encouraging, or cooperating with, the respondents hereinabove named in doing any of the acts and things prohibited by this order, and more particularly collecting from or disseminating among said above-named respondents, or any other member of the respondent Standard Container Manufacturers' Association, Inc., or the wooden container industry, any information as to prices, terms and conditions of sale, or curtailment of production.

"It is further ordered that the respondent James B. Adkins cease and desist threatening, coercing, or, in any wise, intimidating members of the industry in an attempt to induce such members to become a party to such an understanding, agreement, combination or conspiracy, or to maintain prices, terms and conditions of sale or to curtail production in furtherance of any such understanding, agreement, combination or conspiracy.

"It is further ordered that the respondents shall, within sixty (60) days after service upon them of this order, file with the Commission a report in writing setting forth in detail the manner and form in which they have complied with this order.

the evidence and the order is definite, reasonable and responsive thereto. No novel proceeding this, but a more or less commonplace one, the principles, controlling the question before us for decision are well settled by the authorities, and we need not concern ourselves with elaborating upon them. It is sufficient to say that if the commission has jurisdiction, that is, if the practices it investigates and reprobates are in and not merely affecting interstate commerce, Federal Trade Commission v. Bunte Bros., 61 S.Ct. 580, 85 L.Ed. ——, and its findings are responsive to the complaint and supported by evidence, its order may not be set aside if it is responsive to and within the scope of the findings.

■ If, as petitioners seem to assume, the complaint were directed against, and the findings and order were as to, practices, exclusively in intrastate commerce, the proceeding would be beyond the jurisdiction of the commission and would have to be dismissed. But, it is not such a proceeding. The complaint charges, the evidence shows, and the findings establish, agreements and practices to control prices, and business practices in interstate commerce, entered into and jointly engaged in by members of a trade association, some of which are engaged intrastate, some in interstate commerce, and some in both, but all in the same general business of selling containers, and all alike interested in controlling, fixing or regulating prices and practices therein. In such a situation, the commission has authority not over prices fixed and practices carried on without agreement in the State, but over agreements made in the state to control and affect prices and practices both intra and interstate. It is hardly necessary to cite authorities for this view. Some which may be cited are: Federal Trade Comm. v. Standard Educational Society, 302 U.S. 112, 58 S.Ct. 113, 82 L.Ed. 141; National Harness Ass'n v. Federal Trade Comm., 6 Cir., 268 F. 705; International Art Co. v. Federal Trade Comm., 7 Cir., 109 F.2d 393; Chamber of Commerce v. Federal Trade Comm., 8 Cir., 13 F.2d 673.

■ Rejecting the contention of the petitioners then, that the proceeding as to some of them has to do merely with commerce intrastate, and is beyond the jurisdiction of the commission, we proceed to a consideration of the other points, made against the order. The first of these, that some of the petitioners have gone out of business or have taken bankruptcy, may be disposed of by simply saying that the order is not retrospective, but wholly prospective in operation, and if these petitioners are really out of business to stay, they can take no harm from it. But questions of harm aside, they were in business when the proceeding was properly begun against, and jurisdiction properly obtained over, them; that jurisdiction was not lost by their going out of business or taking bankruptcy; and these facts furnish no ground for setting the order aside.

We come then to the merits of the case, whether the evidence sufficiently supports the Board's conclusions, that the Association and all its members have been guilty of unfair trade practices, in endeavoring, by concert of action to raise prices, or otherwise affect prices and practices, or whether only some, or none of them have been.

■ In the beginning it must be stated that petitioner's contention that action under agreement to raise prices is not in itself an unfair practice, that it must also appear that prices are unreasonably affected by the action, will not stand up under the authorities. It is settled law that it is not for those, who, by concert, artificially raise prices, to determine what point is within and what beyond the bounds of reason. The law prohibits price fixing agreements, and all kinds of agreements to regulate the effect of free and fair competition. Federal Trade Comm. v. Beech Nut Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882; Federal Trade Comm. v. Keppel & Bros., 291 U.S. 304, 54 S.Ct. 423, 78 L.Ed. 814; Butterick Publishing Co. v. Federal Trade Comm., 2 Cir., 85 F.2d 522; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129.

■ Petitioners are right in saying that, in the modern climate of political opinion, with its collectivistic and co-operative currents, a great many wind currents, contrary to the long accepted theory of free, unrestricted competition, are now blowing through the world. The cartels, the big and little N. R. A.'s, the government drive for scarcity and higher prices, the great labor combinations, the prohibitions against unfair price cutting, all show that competition may be no unmixed blessing. They may be right too, in their claim, that in their trade area, they are more sinned against than sinning, that the commission in pursuing them, has made a mountain out of a molehill and has let the real culprits

go. But these are not reasons why the order of the commission, that they cease their concert of action, should be set aside. Self-help may not go as far as agreements to uphold prices. That they were unconscious of moral wrong; that they felt they were only striving to bring about living conditions in their industry, colors not only their brief but their evidence. The very strength of their urgence: that their concert of action was in the interest of legitimate business while of great value in maintaining their thesis, that what they did was necessary to save the business and those working in it, from destruction by those pirating upon it, is however their great weakness when they are forced to meet and combat the board's essential finding that, their purposes aside, they were actually engaged in a price-fixing campaign. It stands out clearly enough in the record; that Adkins and Bennett and the members of the Association believed that what they were doing was necessary for the protection and salvation of the industry, and of the people of the state who were dependent on it: that they regarded themselves as not engaged in but as combatting acts of piracy; in short, that they regarded themselves as to an extent, public benefactors. If then, the question to be decided here, were whether upon general moral considerations, the activities of petitioners were beneficial or harmful, it might well be that Adkins' view, that ruinous price cutting was going on, and that for the protection of the industry in Florida, it was necessary to stop it by concert of action, would be found to be sound. But the law as it now stands provides otherwise, and whether the antitrust laws have a good or a bad effect upon the business in question, is not the issue the commission had to decide. That issue was whether the petitioners made the agreements, and did the things they were charged with doing, to raise or affect prices and business practices.

■ Looked at in this light, we think it may not be doubted that the evidence supports the commission's conclusion; that the association as an association had as one of its prime purposes and functions, concert of action, to prevent what they regarded as ruinous competition, by restoring living price conditions to the industry; and that its members were convinced that the only way to do it was by price agreements. The evidence compels this conclusion as to Adkins, it supports it

as to Bennett, the Secretary of the Association, who, while doing lip service to his idea that there should be no open talk in the association about price fixing, printed price lists and distributed them, and it is quite sufficient to sustain the finding that he and the members of the association generally worked with and under Adkins to bring these desired conditions about.

■ The record showing that the president was promulgating, the secretary was printing and distributing price lists, and that the members of the association were adhering, or were being disciplined for not adhering, to them, it is clearly incumbent upon any particular member of the association, complaining of the order as to him, to point to facts showing that his position is different from that of his association, that, in short, he refused to participate in the agreements for or to adhere to the price fixing arrangements, about which the president and the association were so busy. None of them have done this.

■ It remains only to consider petitioner's final complaint of the order, that it is too indefinite to furnish a safe guide to future conduct, is arbitrary and too drastic. In considering these objections, it is well to keep in mind that the order is not self-operative, it merely, by way of protection against making agreements, sets a standard for future conduct. If petitioners really want to obey it, they are in no peril from it, for except in the second clause directed at Adkins, Chazal and Bennett, it sets out clearly enough, we think, the things which are prohibited. These things are not at all individual and independent action on the part of the respondents, but concerted action pursuant to, for the purpose, or with the intent of, carrying out agreements or understandings, by which prices are raised and conditions of doing business are fixed.

■ To make it clear that the second clause is not intended to extend its prohibitions beyond those of the first clause, this clause will be amended by either striking all of it after the words "prohibited by this order", or adding these words at the end of the clause, "pursuant to, for the purpose, or with the intent, of carrying out any of the agreements or understandings as herein prohibited."

The petition to set the order aside is denied. The order as herein modified is affirmed.