## AMERICAN AUTO. ASS'N, Inc. et al. v. SPIEGEL et al.

### Civ. 10516.

United States District Court
E. D. New York.

Nov. 13, 1951.

Leo T. Kissam, New York City (Eric Nightingale, New York City, of counsel), for plaintiffs.

Rubinton & Coleman, Brooklyn (Frank Reiss, New York City and Noel Rubinton, Brooklyn, N. Y., of counsel), for defendant.

BYERS, District Judge.

This is a plaintiffs' motion in a trademark alleged infringement, and unfair competition case, to strike the defendant's answer and for summary judgment. The motion is urged on the showing of the depositions taken by both sides, and the affidavits and exhibits filed with the motion papers, whereby it is urged that the lack of any genuine disputed issues of fact is demonstrated, as distinguished from conclusions to be drawn therefrom.

The plaintiffs respectively are a national association incorporated in 1910 in Connecticut as a non-profit corporation, to be called the Association, and a membership corporation of New York (incorporated in 1934), to be called the Club, the common objects of which are effectuated by participation on the part of the individual members in the diverse activities described in the charter of the first named, and which have for their object the creation and maintenance of the most favorable conditions under which driving and touring by private owners of automobiles can be conducted. These include advocating the enactment of regulatory legislation, highway construction and maintenance, and the compilation and publication of road maps, lists of accredited service and repair stations, stopping places, and the like. The Association was organized in 1902 and incorporated in 1910; at the time of the commencement of this action, it had a membership of 2,700,000 motorists in the United States. The Club has some 210,000 members.

The corporations, as such, promulgate and direct activities appropriate to the accomplishment of the purposes above stated.

The plaintiffs have adopted and widely used a symbol of membership for display by members and other authorized persons, of an arrangement of three capital letters A in an oval; this was registered as a trade-mark in the United States Patent Office in 1937 by the Association for "signs, badges, * * *, made of base metal, in Class 50, Merchandise not otherwise classified". The pictorial representation is of course shown in the certificate, and was republished under the 1946 Act. 15 U.S. C.A. § 1051 et seq. There appear to be eleven registrations in all, under different classifications of articles to which it applies.

The defendant maintains a gasoline filling and service station, and deals in many products which are purchased by motorists for use in connection with cars which they drive. He also displays, without the consent of either plaintiff, and against their protests, a sign in a prominent position on his premises, which reproduces the three AAA's of the plaintiffs' mark or symbol, enclosed in an oval, in such a manner and form as to constitute an adoption and freely acknowledged display thereof, for the avowed purpose of calling attention to the plaintiff organizations. His name and business style do not include a capital A.

The foregoing recital is based upon the pleadings and the motion papers pro and con, together with the exhibits of all litigants.

It sufficiently describes the complaint for present purposes, except in respect of "goods competing with those of plaintiffs and the related companies of plaintiff Association" in paragraph 10; and the alleged use by defendant of such "registered marks, trade-marks and service marks in connection with the sale, offering for sale and advertising of goods and services similar to those rendered and sold by plaintiff Association, plaintiff Club and their related companies, thereby creating confusion \* \* \* and attempting to lead members of the plaintiff Club \* \* \* to believe that the defendant has been approved by plaintiff Association and/or plaintiff Club \* \* \*", in paragraphs 11, 12 and 13.

It will be convenient to discuss those matters in connection with the affirmative defenses.

While the main body of the answer contains denials in one form or another of the entire complaint, except as to the size of membership of the two plaintiffs, it is apparent that the use and display by defendant of the AAA which pertain to the plaintiffs is not denied; it is sought to be justified by the matters alleged in the first, second and third affirmative defenses, namely, (1) and (2), the alleged violation of Article 8, § B36–103.0, of the Administrative Code of the City of New York, respecting the display of a sign not less than 7″ x 8″, stating clearly and legibly the selling price at retail of gasoline and the true name or brand thereof, in that plaintiffs have made arrangements with certain operators of filling stations to display the emblem and to grant a 10% rebate to members of the Association or Club.

That such filling stations are identified by the display of the plaintiffs' symbol or device of the three A's enclosed in an oval. This is alleged to indicate that plaintiffs come into court with unclean hands.

(3) That such arrangements are made with a restricted and selected number of filling stations within a given area (namely, about 250 out of 700 in the Borough of Brooklyn), whereby the operators are enabled to and do wage "a competition that is destructive of the business of gasoline filling stations in the same area which do not have such arrangement and which do not display such symbol".

That the plaintiffs' symbol is thus being used in the unlawful restraint of trade, "and to aid in the creation of a monopoly in the sale of gasoline at retail in the City of New York and is therefore being illegally used, and plaintiffs come into court with unclean hands and are estopped to and may not seek the aid they ask of the Court".

Since the depositions and exhibits completely lay bare the conduct of the defendant of which plaintiffs complain; and since the activities of the plaintiffs relied upon by the defendant to defeat recovery are not denied, but are fully revealed in their own depositions and in such exhibits as constitute the literature published and distributed by either or both plaintiffs and the uniform contracts made with the filling stations which are referred to in the separate defenses, it seems clear that all evidence which could be produced at a trial—and the defendant's briefs point to nothing more that could be developed under the pleadings than has thus been shown—is in this record as made. The court has been sufficiently informed of all relevant testimony to enable it to render a decision under Rule 56, Fed.Rules Civ.Proc. 28 U.S. C.A. upon the theory that there remains no genuine issue as to any material fact.

Oddly enough, the defendant's brief denounces much of the plaintiffs' activities, but seems to argue that what it characterizes as illegal provides good reason for the defendant's adoption and display of the symbol or trade-mark AAA as registered. This reasoning is difficult to follow. Consistency would seem to require that the worse the conduct of the plaintiffs in the defendant's eyes, the more anxious he would be to avoid doing business under its emblem; but the showing of the photographic exhibits is precisely to the contrary.

One of them (Pl.Ex. 3) is of a large and conspicuous sign containing the three A's in an oval, the letters being topped by "Trade with us" and beneath, and within the oval appears in large letters: "We

honor above emblem members". At the bottom of the sign, in small inconspicuous and barely legible characters, there appears: "We are not Automobile Club Affiliates".

The purpose of the sign is too flagrant to admit of discussion. The defendant's deposition is quite illuminating on the subject, and later will be quoted in part.

Stated shortly, the defendant relies upon the clearly established practice of the plaintiffs to defeat recovery, namely, that the Club licenses certain selected filling and service stations and supply shops, in this county, to display the 3 A emblem, symbol and trade-mark as selected purveyors of automobile supplies and service; and to issue to members of the Club, coupons representing 10% of the charge (ex taxes) made in each transaction; such coupons are turned in to the office of the Club, and the amount is credited to that member's account. The coupons were first bought from the Club and paid for by the dealer from whom a given purchase was made. The details of the operation of the plan, which is called "Savings plan" on the AAA sign exhibited by the licensed dealer or service station operator, are explained at length in the depositions of the witnesses Powers and Colodny, officers of the Club, taken at the instance of the defendant on April 16, 1951.

The showing is that of cooperative buying by the individual Club members from agencies chosen by the Club, that cater to the needs of individual motorists. The testimony is not contradicted that a selective process is employed by the Club in deciding which dealers it will thus suggest to its members as being worthy of their patronage, in which location, proximity to other such dealers, type of management, and the establishment itself, are the determining factors. Each such dealer holds a written contract which is in evidence, that is of indefinite duration but is subject to cancellation by either party on 7 days' notice.

Its terms are appropriate to accomplish the purpose which has been described, by which the dealer engages to deliver coupons to members of the Club only and on presentation of membership cards; cash may not be paid in lieu of coupons, nor can a dealer redeem coupons which have been issued by other accredited dealers.

The legal rights of the defendant are said to be infringed by the operations so described, in that:

(a) Article 8, Administrative Code of the City of New York, having to do with retail sales of Petroleum Products, is being violated by the said selected dealers, since the display of the emblem or symbol AAA in the oval, with the legend "Savings plan" as stated, " * * * signifies, notifies and advises members of the plaintiffs that gasoline and petroleum products were being offered for sale to them and could be purchased by them at a discount or rebate of 10 per cent of the price appearing upon the sign or placard posted on the premises in accord with the aforesaid provisions of the * * * Code".

The requirement of the latter is for the posting of a sign of specified dimensions, with the name, etc., of the brand of gasoline, its grade and quality, and the price per gallon. That no sign "stating or referring directly or indirectly to the price or prices of gasoline * * * shall be posted * * *" other than the one prescribed. The text of the regulation is attached hereto as an appendix, for ready reference.

The constitutionality of this local law was upheld in People v. Arlen Service Stations, 284 N.Y. 340, 31 N.E.2d 184, 185. In the course of its opinion the Court said: "Section B36–101.0 of the Administrative Code, quoted above, bears upon its face clear indication that it was designed to prevent fraud in the retail sale of gasoline."

Again, 284 N.Y. at page 344, 31 N.E. 2d at page 185: "It cannot be said of this local legislation that it impairs the defendant's freedom to determine the price at which it will sell the gasoline which it offers to the public, nor does it prohibit the defendant from advertising that price."

■ The foregoing accords with the defendant's own understanding, as his deposition discloses: He explained that the AAA sign displayed by competitors who were

so authorized, enabled them to harm his business (page 35): "It is hurting my business to the extent that they were giving a discount and we weren't. I wanted to post a discount sign but my association won't allow me. * * * You see, we have a law in the City of New York, a price-posting law, and that doesn't permit posting a discount or a price. You see, I could go to work and post a price—let's say at a two-cent discount—to meet competition, but they won't allow me. Therefore, I felt the AAA, if I put that (sign) up, I will get that business and give them the discount."

"Q. When you say 'the association won't allow me', what association are you referring to? A. There is a gasoline merchants of Brooklyn association.

"Q. And you are a member of that? A. Yes.

"Q. If you wanted to reduce the price of your gasoline two cents, there would be no objection to your doing that, would there? A. Yes, but I couldn't advertise it.

"Q. Couldn't you reduce the price on your listing two cents? You post the price of your gasoline, do you not? A. That's right, but that isn't seen. You see, that is only a small sign on the pumps, and the average motorist passing by can't read that unless he pulls in.

"Q. But if he pulls in he can read it? A. If he pulls in I can tell him.

"Q. Is there anything to stop you from putting up a large sign quoting the price of your gasoline? A. There is a law against that.

"Q. But there is nothing to stop you from reducing the price two cents if you wish to do it? A. No."

The foregoing refutes any possible argument that the plaintiff Club or the Association is violating the provisions of the local law, for it is the members of the defendant's association and not the Club or the dealers whom it authorizes to display its emblem, who interfere—according to the defendant's understanding at least—with his capacity to sell gasoline at any figure that is acceptable to him. It is to be re-membered also that the local law does not purport to affect items, other than gasoline, dispensed at filling stations and automobile supply and service depots.

The AAA sign does not quote prices; it merely informs the public generally that the Club has licensed a given purveyor to display the emblem; it carries also to members the special meaning which has been explained. That meaning is also somewhat expanded in the numerous pamphlets issued by either or both plaintiffs, which are in evidence and which explain in detail the respects in which the Association and the Club promote the special interests of their members, particularly those driving in unfamiliar places.

■ Unless and until cooperative purchasing is condemned by statute, of which there is no clear and present indication, the Club cannot be held to participate in a violation of the local law in question; nor to have been discovered in the exhibition of unclean hands so as to forfeit the protection of a court of equity for its symbol or emblem of identity or membership.

The second and third defenses are addressed to the same fundamental justification of the defendant's revealed practice, but upon a broader theory involving (a) the alleged invalidity of the Association's registered trade-mark AAA, and (b) that it is so used as to violate the United States Anti-trust Laws and the corporate charters of the respective plaintiffs.

These defenses require but little discussion:

As to the trade-mark registrations, there are several in evidence referred to sundry items, some of which are sold by the Association to its subordinate Clubs in various parts of the country, such as signs, maps, printed books, portfolios, belts, etc., and the earliest date of any registrations seems to be 1916. That is No. 112,980, renewed in 1936.

This registration—discreetly enough—is not discussed in the defendant's briefs. The plaintiffs' testimony concerning sales of trade-marked articles to the general public is confined to a publication entitled "Sportsmanlike Driving".

■ Just why the defendant should be heard to deny the validity as a trade-mark embodied in that which he displays for the reasons quoted from his deposition, has not been made to appear.

It is clear that he is intentionally trading upon the AAA symbol and trade-mark, not because he deems it invalid, but because as he said: "I will get that (the AAA) business and give them the discount."

■ There is no offer of proof and of course no testimony in the record, of violation of the anti-trust laws, since there is no assertion of an agreement between either plaintiff and any manufacturer or distributor touching resale prices or similar devices.

The defendant seemingly relies upon Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363, and Bruce's Juices v. American Can Co., 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219. The first holds that a patentee cannot recover an injunction to prevent infringement of his patent where the granting of licenses under it required as a condition, that unpatented salt tablets of its manufacture alone could be used in the patented machine, following among other cases, Carbice Corp. of America v. American Patents Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819. The bearing of this decision has not been explained.

The second held that it is not a defense to an action in a state court to recover on notes given in the course of a running account to pay for cans sold by the plaintiff to the defendant, that the former violated the Robinson-Patman Act, 15 U.S.C.A. §§ 13, 13(a), 13a, in the sales giving rise to the notes. Again, the assistance of that decision to this defendant is not explained.

The arguments advanced for the defendant to avert an injunction for the flagrant violation of the plaintiffs' emblem, device and trade-mark, as distinguished from the testimony found in the depositions and exhibits, are quite ill adapted to the task in hand.

■ The contention seems to be advanced that the plaintiffs' symbol is being used to misrepresent to the consuming public that the various well-known brands of gasoline which the authorized dealers purvey when they exhibit the 3 A's sign, are the product of the plaintiffs, and therefore that the registered trade-mark is being unlawfully displayed at the instance of the plaintiffs. It is difficult to understand how such a contention can be seriously advanced. Obviously that is not the fact, and the emblem is displayed to identify the dealer himself, and not the products which he sells. The citation of Gruelle v. Molly-'es Doll Outfitters, Inc., 3 Cir., 94 F.2d 172, is so wide of the issue here, that it is not understood. There is no palming off of goods here involved, but a misappropriation of a symbol indicating a selection of a dealer made by the Club for the benefit of its members, and certain incidents flowing therefrom.

Affiliated Enterprises, Inc., v. Gantz, 10 Cir., 86 F.2d 597, is cited, but since it holds that the "bank night" scheme formerly operated in moving picture theaters so strongly partook of the nature of a lottery, that a copyright registration in connection therewith could not support intervention by a court of equity, the reason for the citation is a mystery.

Standard Container Manufacturers' Ass'n, Inc., et al. v. Federal Trade Commission, 5 Cir., 119 F.2d 262, has to do with a price-fixing device, thus the court in denying a petition to set aside a "cease and desist" order said, 119 F.2d at page 266: "The record showing that the president (of the association) was promulgating, the secretary was printing and distributing price lists, and that the members of the association were adhering, or were being disciplined for not adhering, to them, * *". There is not a suggestion of any such activity on the part of these plaintiffs, and since their members are buyers, not sellers, it is obvious why the defendant tenders no evidence to that effect.

Giving the utmost credence to the defendant's case as pleaded and portrayed in his deposition and exhibits, it is clear to this court that the motions of the plaintiffs must be granted, and a decree conforming to the prayer for relief must be ordered,

with one bill of costs to the plaintiffs to be taxed.

Settle order and decree on notice.

## Appendix

## Administrative Code of City of New York

### Article 8

### Retail Sales of Petroleum Products

"§ B36–103.0 Placards to be posted.—a. It shall be unlawful for any person, firm or corporation to sell or offer for sale at retail for use in internal combustion engines in motor vehicles any gasoline unless such seller shall post and keep continuously posted on the individual pump or other dispensing device from which such gasoline is sold or offered for sale a sign or placard not less than seven inches in height and eight inches in width nor larger than twelve inches in height and twelve inches in width and stating clearly and legibly in numbers of uniform size the selling price or prices per gallon of such gasoline so sold or offered for sale from such pump or other dispensing device together with the name, trade name, brand, mark or symbol, and grade or quality classification, if any, of such gasoline.

"b. The amount of governmental tax to be collected in connection with the sale of such gasoline shall be stated on such sign or placard and separately and apart from such selling price or prices.

"c. No sign or placard stating or referring directly or indirectly to the price or prices of gasoline other than such signs or placards as hereinabove provided shall be posted or maintained on, at, near or about the premises on which said gasoline is sold or offered for sale.

"d. It shall be unlawful for any person, firm, or corporation, in connection with the sale or offer for sale at retail of any petroleum products for use in motor vehicles, other than gasoline, to post or maintain at such place of sale or offer for sale, any sign, placard, or other display that states, relates or refers to, the price at which such petroleum products are sold or offered for sale, except as follows:

"1. Such sign, placard or other device shall be not less than seven inches in height and eight inches in width, nor larger than twelve inches in height and twelve inches in width.

"2. The price stated, mentioned or referred to on such sign, placard, or other display, shall be by the unit of the measure at which such petroleum products are customarily sold at retail.

"3. The name, trade name, brand, mark, or symbol, and grade or quality classification if any, of such petroleum products, shall be clearly stated on such sign, placard, or other display, and if such petroleum products are sold without identification by name, trade name, brand, mark, or symbol, such sign, placard, or other display shall refer clearly to such petroleum products as unbranded. ·

"4. If such petroleum products are sold or delivered by or through the means of dispensing equipment, such sign, placard, or other display shall be posted and maintained on such dispensing equipment and at no other place. (As added by L.L.1939, No. 141, August 10; as amended and renumbered by L.L.1941, No. 56, July 15.)

"§ B36–104.0 Fraudulent practices prohibited.—It shall be unlawful for any person, firm or corporation to sell or offer for sale gasoline or other petroleum products· for use in motor vehicles at retail in any manner so as to deceive or tend to deceive the purchaser as to the price, nature, quality or identity thereof, or to sell or offer for sale from any pump, dispensing device, or container any gasoline or other petroleum products other than that gasoline or other petroleum products manufactured or distributed by the manufacturer or distributor marketing such gasoline or other petroleum products under the name, trade name, brand, symbol or mark affixed to or contained on such pump, dispensing device or continer, or to substitute, mix or adulterate gasoline or other petroleum products sold or offered for sale under a name, trade name, brand, symbol or mark. (As added

by L.L.1939, No. 141, August 10; as amended and renumbered by L.L.1941, No. 56, July 15.)

"§ B36–105.0 Violations.—Violation of any of the provisions of this article shall, upon conviction therefor, be punished by a fine of not more than two hundred fifty dollars or by imprisonment for not more than sixty days, or by both such fine and imprisonment. (As added by L.L.1939, No. 141, August 10; as amended and renumbered by L.L.1941, No. 56, July 15.)"